IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

LOREEN PALLAS,                          )
                                        )
                    Plaintiff,          )
                                        )
    vs.                                 )
                                        )
UNITED STATES OF AMERICA,               )    No. 3:12-cv-0122-HRH
                                        )    (Consolidated with
                    Defendant.          )    No. 3:13-cv-0185-HRH)
_____ )


FINDINGS OF FACT AND
CONCLUSIONS OF LAW

Proceedings

Plaintiff Loreen Pallas' complaint against the defendant United States of America was filed June 11, 2012.¹ Plaintiff's complaint states a cause of action for medical malpractice based upon the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. Defendant's answer was filed August 16, 2012.² Defendant denies plaintiff's claim for medical malpractice.

By complaint filed in the Superior Court for the State of Alaska, Third Judicial District at Anchorage, on February 1, 2013, plaintiff filed a second complaint against the Cordova Community Medical Center, owned and operated by the City of Cordova.³ In

---

¹Docket No. 1.

²Docket No. 5.

³See Notice of Lodging State Court File, Exhibit 6, Docket No. 18-6.

Findings of Fact and Conclusions of Law                                    - 1 -

this complaint, plaintiff stated claims for negligence, "violation of rights," and fraud and misrepresentation, all flowing from the same circumstances giving rise to plaintiff's complaint against defendant. The Cordova Community Medical Center and the City of Cordova answered, denying and seeking dismissal of plaintiff's complaint.[4] Plaintiff's state court case was removed to this court as <u>Pallas v. Cordova Community Medical Center</u>, Case No. 3:13-cv-0185, on September 23, 2013. Plaintiff's cases were consolidated by order of September 30, 2013.[5]

By order of October 16, 2014,[6] the court granted the motion for summary judgment brought by Cordova Community Medical Center and the City of Cordova. Judgment dismissing plaintiff's complaint as to Cordova Community Medical Center and the City of Cordova, with prejudice, was entered October 17, 2014.[7]

The issues raised by plaintiff's complaint against defendant were tried to the court without a jury beginning October 5, 2015, and concluding October 7, 2015. At the conclusion of trial, the court called upon the parties to serve and file written final arguments and proposed findings of fact and conclusions of law. These filings have been made.[8]

---

[4] Docket No. 18-8.

[5] <u>See</u> Docket No. 7 in <u>Pallas v. Cordova Community Medical Center</u>, Case No. 3:13-cv-0185.

[6] Docket No. 38.

[7] Docket No. 39, and Docket No. 9 in <u>Pallas v. Cordova Community Medical Center</u>, Case No. 3:13-cv-0185. These proceedings also terminated the Cordova defendants' third-party proceedings against defendant United States of America.

[8] Docket Nos. 110, 111, 117, and 118. Plaintiff's corrected reply to defendant's final argument was served and filed March 21, 2016, Docket No. 122.

Findings of Fact[9]

1.    Plaintiff, born April 28, 1952, lives in Cordova and was a resident of Cordova in 2009. Plaintiff owned and operated a child care business known as "Children's Pallas." Plaintiff and her husband filed joint tax returns in connection with plaintiff's child care business and a second business operated by Mr. Pallas, "Northern Delights," an ice cream and sandwich shop. Plaintiff's husband, Noel, died in 2014. In 2009, Mr. Pallas was a member of the Ilanka Community Wellness Advisory Committee. Nicole Nothstine, plaintiff's daughter, was a resident of Cordova in 2009.

2.    Ilanka Community Health Center (Ilanka) is a primary care health clinic owned and operated by the Alaska Native Village of Eyak. In 2009, the Ilanka clinic was open during the daytime, Monday through Friday, and closed on weekends. Ilanka was plaintiff's primary health care provider.

3.    Cordova Community Medical Center (CCMC) is a community hospital owned and operated by the City of Cordova. In 2009, CCMC's hospital was open seven days a week, 24 hours a day. CCMC also operated a long-term nursing care facility and an emergency room in the same building.

4.    The Ilanka clinic and the CCMC hospital were located in the same building in Cordova in 2009.

5.    Phillip A. Hess, M.D., a board certified, family medicine and family practice physician, became medical director and staff physician at Ilanka in 2008, and was so employed in 2009.

---

[9] The court's Findings of Fact are based upon the parties' *Joint Statement of Issues and Undisputed Facts*, Docket No. 75; the three-volume transcripts of trial testimony, Docket Nos. 106, 107, and 108; and exhibits admitted during trial, see Docket No. 100.

6. Joan Wisel (formerly Phillips) was a registered nurse at Ilanka. Nurse Wisel had 32 years' experience, and had worked for the CCMC until September 25, 2009, on which date she became an employee of the Ilanka clinic.

7. In the spring of 2009, it was anticipated by federal, state, and local health care authorities that there would be a potentially serious, H1N1 flu epidemic in the fall of 2009. Health care and related authorities in Cordova, Alaska, formed a task force to address this threat. The task force included representatives of the Cordova Hospital, the Ilanka clinic, and representatives of other local agencies. Protection of CCMC's long-term nursing patients was a particular concern.

8. By May of 2009, the task force had agreed upon a protocol for dealing with residents experiencing flu symptoms. There was no formal, written version of the protocol. However, the protocol called for signage at the CCMC and Ilanka clinic, and for the establishment of a recorded and telephonically available message which embodied the important aspects of the protocol.[10] The Ilanka clinic protocol for addressing H1N1 flu epidemic concerns was consistent with CDC and State of Alaska health authorities' publications.

A transcript of the telephonic H1N1 flu recording,[11] in pertinent part, advised callers having H1N1 and symptoms:

> ...if the sick person has a temperature of 100º and other flu symptoms, you should call one of our clinics. DO NOT GO there.... Please call first. They will then advise you what the next step should be.

The message continued:

---

[10]Defendant's Exhibit O. This exhibit confirms the use of 424-8888 for purposes of hearing the recorded message.

[11]Defendant's Exhibit I.

> **When do you seek <u>Emergency</u> Medical Care??? Like going to the ER?**

The message then explained:

> Obviously, you will get medical care right away if the sick person at home:
>
> • has difficulty breathing or chest pain
>
> • has signs of dehydration such as dizziness when standing, absence of urination, or in infants, a lack of tears when they cry
>
> • is less responsive than normal

The telephonic message continued with advice as to where further information could be obtained (a CDC website) and concluded

> ...if you or your loved one have any of the serious symptoms described above or just cannot figure out what is the best thing to do ... then, and only then ... call the hospital @ 424-8000. <u>Id.</u>

9. Consistent with the recorded message, signs were conspicuously posted on the building occupied by the Ilanka clinic and the CCMC hospital in May of 2009, The sign on the Ilanka clinic door read:

> STOP [in a highway sign configuration]
>
> If you have any flu symptoms <u>DO NOT ENTER</u> the building! Go home and call 424-8888.[12]

10. Plaintiff acknowledged that there was a sign at the entrance of the Ilanka clinic, telling those approaching not to enter the clinic if they were experiencing flu symptoms. Plaintiff and some others testified that the "stop" sign did not advise people to call 424-8888 (what the parties refer to as a "hotline"). Plaintiff and the others are mistaken. Plaintiff testified that she was told not to call the clinic; but that statement is

---

[12]Plaintiff's Exhibit 12 at 1000002.

not believable.  Plaintiff's physical evidence establishes the fact that the stop sign did provide a phone number that people experiencing flu symptoms could call for information.[13]  Plaintiff may not have remembered the hotline phone number, but Mr. Pallas surely knew of the hotline because of his association with the Ilanka Community Wellness Advisory Committee.  There is no evidence that the Ilanka clinic or CCMC telephones were not operable during October of 2009, or that those telephone numbers were unavailable to plaintiff or her family members.  There was nothing preventing plaintiff or her family members from calling the hotline, the CCMC, or the Ilanka clinic in October of 2009.

      11.     Dr. Hess trained the Ilanka clinic staff with respect to the protocol developed by the task force.  Persons with flu symptoms calling the Ilanka clinic were to be asked about their symptoms, and in particular were to be asked if they were experiencing:

- chest pain and breathing problems
- shortness of breath
- dehydration – vomiting, diarrhea
- fever for more than five days
- loss of appetite and difficulty eating
- dizziness or fainting spells

Dr. Hess considered chest pain and shortness of breath to be "red flags," indicating pneumonia as opposed to flu.  Persons were to be advised to come to the clinic if their symptoms progressed.

---

[13]Id.

12. Nurse Wisel was trained by Dr. Hess to follow the above protocol. Persons calling the Ilanka clinic with flu symptoms were referred to the clinic's Nurse Wisel.

13. At the end of the day on Friday, October 9, 2009, plaintiff felt worn out and tired. On Saturday, October 10, she did not feel well, she was dizzy and was vomiting. She could not hold down fluids. She took Tylenol for a fever.

On Sunday, October 11, plaintiff could not get out of bed. She felt quite ill and had a temperature of 104 degrees. The Tylenol was not working. She felt achy.

On Monday, October 12, 2009, plaintiff still felt unwell and was experiencing chest pain. She knew she was ill, but testified that she did not realize how ill she was. Neither plaintiff nor a family member called the hotline, CCMC, or the Ilanka clinic on October 9, 10, 11, or 12. Even if plaintiff were correct that the "Stop" sign had no telephone number on it (which it did), plaintiff never did the obvious: call CCMC on Sunday or the clinic on Monday. Had plaintiff or one of her family called the hotline, or the CCMC, or the Ilanka clinic and advised of her chest pain and related symptoms, she would have been prompted to seek medical help at once.

14. On Tuesday, October 13, 2009, she felt either the same or worse, and described the pain as being unbearable. She had a hard time breathing. Plaintiff recognized that she needed help. On Tuesday, October 13, 2009, Nurse Wisel took a telephone call from Ms. Pallas' daughter, Nicole Pallas-Nothstine. The court infers that this call was made in the presence of plaintiff. Ms. Nothstine related plaintiff's symptoms to Nurse Wisel, but she said nothing to the nurse about chest pain or shortness of breath. Nurse Wisel knew that chest pain and shortness of breath were serious symptoms suggesting pneumonia. Nurse Wisel testified that she would have had plaintiff come to the clinic had she been informed of chest pain. Nurse Wisel did not inquire of

Ms. Nothstine – nor seek to have Ms. Nothstine inquire of plaintiff – about difficulty in breathing, chest pain, or other symptoms of pneumonia.

Nurse Wisel affirmed that she had been instructed with respect to the protocol by Dr. Hess. Nevertheless, Nurse Wisel testified that it was her practice to leave patients on a "positive note."[14] It was her practice not to inform patients with respect to possible developments of their flu symptoms. She testified that she would not tell Ms. Nothstine: "if your mother has chest pain, etc., go to the ER."[15] Nurse Wisel was asked directly, "is it correct you did not ask if – if Ms. Pallas had chest pain?" Ms. Wisel answered, "I did not ask that."[16] Similarly, Nurse Wisel was asked if she had inquired about breathing problems, to which she responded, "I didn't ask – I did not ask was she having breathing problems. I asked, 'are there any other symptoms' after she told me that and reviewed that these generalized symptoms sounded like the flu."[17] Although Nurse Wisel recognized that the clinic should know if the patient had an illness more serious than flu, she nevertheless failed to ask the questions which would have, under the protocol, called for plaintiff to come to the clinic or the CCMC without further delay. Plaintiff was not told to come to the Ilanka clinic.

15. On Wednesday, October 14, Mr. Pallas attended a clinic advisory committee meeting, and after the meeting told the then-director of the Ilanka clinic, Keren Kelly, that his wife was sick. Ms. Kelly told Mr. Pallas, "bring her in." At this time, Dr. Hess was not involved in any way in the handling of plaintiff's illness by the Ilanka

---

[14]Tr. 3:126.

[15]Tr. 3:127.

[16]Tr. 3:128.

[17]Tr. 128.

clinic. Plaintiff was brought to the Ilanka clinic in the afternoon of Wednesday, October 14. It was determined that she did not have the flu, and she was promptly transferred to the CCMC emergency room where she was diagnosed with pneumonia.

16. In the CCMC emergency room, plaintiff received intravenous fluids, antibiotics, and oxygen. Her chest was X-rayed. CCMC staff determined that plaintiff's illness had become so critical that the Ilanka clinic could not adequately treat her. Arrangements to med-evac plaintiff to Anchorage were made immediately. On October 15, 2009, plaintiff was transported by air med-evac to the Alaska Regional Hospital in Anchorage, Alaska.

17. Prompt treatment of pneumonia is critical. Pneumonia can get out of control if not timely treated with antibiotics. About 24 hours elapsed between the time that Nurse Wisel talked to Nicole Nothstine and the time that plaintiff was treated at CCMC. Had plaintiff sought treatment or had she been called in to the Ilanka clinic on Monday or Tuesday (October 12 or 13, 2009), rather than presenting for treatment in the late afternoon of Wednesday, October 14, 2009, plaintiff's pneumonia would not have been so critical, and a med-evac to Anchorage might not have been necessary.[18]

---

[18]Plaintiff's medical expert Dr. Gavi's report stated that "[h]ad Ms. Pallas been properly evaluated by Cordova Health Center/Ilanka Health Center several days prior to October 14, 2009, Ms. Pallas would have been treated sooner. Early treatment of her respiratory infection with antibiotics would have entirely avoided the hospitalization or led to a significantly shorter length of hospitalization. Furthermore, in October 2009, earlier treatment would have reduced the negative impact of her respiratory infection on her overall health and quality of life." Plaintiff's Exhibit 8. This exhibit is not in evidence but has been made part of the record for purposes of preserving defendant's objections to Dr. Gavi's live testimony. Tr. 3:4, et seq. In his live testimony, Dr. Gavi testified that, "[a]pproximately 24 hours earlier, if she received antibiotics at that point, it would have markedly – it would have a significant effect on the severity of pneumonia because 24 hours of bacterial pneumonia without an antibiotic, the situation can get out of control. And so had she been treated, for example, 24 hours earlier, then this would have been shorter hospitalization or possibly managed as an outpatient." Tr. 3:30.

(continued...)

18. The flight to Anchorage was uncomfortable because of unsettled weather. At the Alaska Regional Hospital, plaintiff was admitted to the intensive care unit with a diagnosis of bacterial pneumonia. Plaintiff experienced difficulty in eating during her hospital stay. Plaintiff's condition improved, and after 5 to 7 days she was released into the general hospital population. She was hospitalized at Anchorage from October 15 to October 25.[19]

19. Plaintiff returned to Cordova and resumed work at her child care business on a limited basis and was able to return to full-time work by early 2010.

20. Plaintiff's medical expenses for treatment of pneumonia at CCMC totaled $4,212.70. Plaintiff's medical expenses for treatment of pneumonia at Alaska Regional Hospital (including med-evac expenses) were $128,136.40. Plaintiff's total medical expenses associated with her illness were $132,349.10.

---

[18](...continued)

The Government's objection to the latter quoted testimony is overruled, for Dr. Gavi's live testimony does not unreasonably or unfairly depart from the substance of his written report.

On the basis of AS 09.20.185, defendant objects that plaintiff's expert Dr. Gavi was not qualified to testify on the standard of care of Dr. Hess, a family medicine physician in Cordova. Dr. Hess is a board certified, family care physician, whereas Dr. Gavi is not. That objection is overruled for the reason that the medical issues here do not involve Dr. Hess or family practice per se. Rather, what is at issue here is the treatment of pneumonia. As a board certified, internal medicine physician, Tr. 3:4, Dr. Gavi is qualified to testify as to the treatment of pneumonia. Moreover, there was no failure on the part of Dr. Hess or the Ilanka clinic as regards the management of the clinic staff. Rather, the issue here has to do with the failure of Ilanka clinic staff to adhere to the applicable standard of care which required Nurse Wisel to ascertain the full extent of plaintiff's symptoms for purposes of the treatment of plaintiff's internal medicine complaints.

[19]Just before plaintiff was discharged from the Alaska Regional Hospital, she fell and apparently injured her left leg. The fall was not reported to anyone, and there is no medical evidence that the fall or several months of limping were in any way attributable to or caused by pneumonia.

21. The gross receipts from plaintiff's child care business were $98,198.00 in 2008 and $81,000.00 in 2009. Plaintiff attributes the loss in gross revenue to her absence from the business and inability to serve the same number of children following her illness. Plaintiff seeks to recover a total of $17,198.00 for lost business revenue.[20] The sum of $17,198.00 is a reasonable approximation of plaintiff's business loss claim associated with her illness.

22. Plaintiff suffered no physical impairment or disability as a consequence of her illness. Plaintiff did experience discomfort, pain, suffering, inconvenience, and emotional distress as a consequence of her illness. The court places a value of $50,000.00 on plaintiff's non-economic loss(es).

23. Plaintiff and defendant were equally responsible (at fault) for the delay in treatment of plaintiff's pneumonia, which was becoming progressively more serious Monday, October 12, to Wednesday, October 14, 2009.

---

[20]Tr. 1:95. Plaintiff's testimony concerning her business loss claim, Tr. 1:88, et seq., is confusing. The questioning appeared to conflate plaintiff's child care business loss claim with losses associated with Mr. Pallas' Northern Delights business. However, the answers given by plaintiff appear to be based upon plaintiff's Exhibits 8 and 9, and in particular the Schedule C ("Profit or Loss from Business Returns") for the child care business which were a part of the Pallases' joint federal income tax returns. The gross profit figures set out above derive from the profit and loss from business forms for the child care business. No claim has been made by or on behalf of Mr. Pallas in connection with his separate business.

## Conclusions of Law

1.  Plaintiff's complaint is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. The court has jurisdiction of claims brought against the United States based upon the negligent act or omission of any employee of the United States. 28 U.S.C. § 1346(b)(1). The liability of defendant for the acts of employees for which defendant is otherwise responsible is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1), § 2674.

2.  The Department of Health and Human Services of the United States Government is vicariously liable for the acts or omissions of its employees and agents, including employees of the Ilanka clinic operated by the Native Village of Eyak. Defendant admits that the Native Village of Eyak, d/b/a Ilanka Community Health Center, is eligible for Federal Tort Claims Act coverage pursuant to 42 U.S.C. § 233(g) - (n). Employees of the Ilanka clinic are employees of the United States for purposes of 28 U.S.C. § 1346(b).

3.  Pursuant to the Federal Tort Claims Act, defendant is liable to plaintiff for the acts of employees of the Ilanka clinic:

> in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

28 U.S.C. § 2674.

4.  It is undisputed that plaintiff complied with the administrative claims process. Plaintiff's claim was denied.

5.  The discretionary function exception to the Federal Tort Claims Act has no application in this case where plaintiff claims that defendant has negligently failed to

adhere to the applicable standard of care and to employ a relevant policy of the Ilanka clinic.

6. In a medical malpractice case, Alaska law places the burden of proving the applicable standard of care, a breach of the standard of care, and that the alleged breach caused injury and damages upon the plaintiff. AS 09.55.540(a). "In malpractice actions, there is no presumption of negligence on the part of the defendant." AS 09.55.540(b). And "[i]njury alone does not raise a presumption of the health care provider's negligence or misconduct." AS 09.55.550.

Under Alaska law,

> In an action based on fault seeking to recover damages for injury or death to a person ... contributory fault chargeable to the claimant [here plaintiff] diminishes proportionately the amount awarded as compensatory damages for the injury attributable to the claimant's contributory fault, but does not bar recovery.

AS 09.17.060.

Under Alaska law,

> Apportionment of damages.
>
> (a) In all actions involving fault of more than one person ... the court ... shall make findings, indicating
>
> (1) the amount of damages [the] claimant would be entitled to recover if contributory fault is disregarded; and
>
> (2) the percentage of the total fault that is allocated to [the] claimant [and] defendant....
>
> (b) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each person at fault, and the extent of the causal relation between the conduct and the damages claimed.

AS 09.17.080.

7. The standard of care applicable to Nurse Wisel in communicating with plaintiff about her illness required that she get a detailed medical history. In particular, she had a duty to affirmatively inquire into plaintiff's specific complaints.

8. The Ilanka clinic H1N1 protocol was not inconsistent with the standard of care which the clinic owed plaintiff. Nurse Wisel had a duty, based upon the Ilanka clinic H1N1 protocol, to affirmatively ask callers experiencing flu symptoms whether they were also experiencing chest pain, shortness of breath, vomiting, or diarrhea. The oblique question ("are there any other symptoms?") was not consistent with the Ilanka clinic's protocol. While it may be inadvisable to tell persons with flu symptoms that their symptoms may progress to something more serious, there is an important difference between ascertaining a person's symptoms and telling the person what could happen. Clinic staff had a duty to ascertain whether or not plaintiff was experiencing chest pain, shortness of breath, vomiting, or diarrhea. Without those inquiries, the clinic staff could not properly evaluate whether or not plaintiff was in need of hospitalization. Nurse Wisel breached that duty.

9. Ilanka clinic is vicariously liable for the conduct of its employee, Nurse Wisel, and defendant is as a matter of federal law liable for the fault attributed to Ilanka clinic.

10. Plaintiff had a duty to timely and accurately report her symptoms to a health care provider, and a duty to timely seek medical aid for illness. Plaintiff breached that duty by failing to timely seek medical advice as her symptoms of illness other than flu developed.

11. As the proximate result of the breach of duty by Nurse Wisel, plaintiff's illness was aggravated and Ilanka clinic is vicariously liable for aggravation of plaintiff's

illness. Defendant is liable to plaintiff for an appropriate apportionment of plaintiff's medical expenses, lost revenue, and non-economic losses.

12. Defendant is not at fault for plaintiff having contracted pneumonia in the Cordova community. Plaintiff was going to have to go to the CCMC anyway, had she or the clinic staff timely gotten her in. Plaintiff would have incurred some medical expenses had she gone to and been seen at the Ilanka clinic and/or CCMC 24 to 36 hours sooner than mid-afternoon on Wednesday, October 14, 2009. Medical expenses actually incurred by plaintiff at CCMC in connection with the illness totaled $4,212.70. The court accepts that number as a reasonable approximation of medical expenses that plaintiff would have incurred had her illness not gone critical due to the delay of treatment until mid-afternoon on October 14, 2009, and thereafter.

13. Plaintiff's pneumonia went critical due to the combined fault of plaintiff and defendant in delaying treatment. The conduct (or lack thereof) by plaintiff and Nurse Wisel are of the same nature: plaintiff failed to advise Nurse Wisel of her specific symptoms in a timely fashion, and Nurse Wisel failed to inquire about plaintiff's specific symptoms. The causal connection between plaintiff's fault and Nurse Wisel's fault is equally strong. The aggravation of plaintiff's illness flowing from the combined fault of plaintiff and Nurse Wisel necessitated the med-evac to Anchorage and 10 days at Alaska Regional Hospital, costing $128,136.40.

14. In accordance with AS 09.17.080, the court apportions fault as between plaintiff and defendant as follows:

- <u>50</u>% to plaintiff
- <u>50</u>% to defendant

15. The court apportions plaintiff's medical expenses, lost revenue, and non-economic losses employing plaintiff's and defendant's respective percentage of fault as follows:

- medical expenses:

    $128,136.40 × 50% = $64,068.20

- loss of revenue:

    $17,198.00 × 50% = $8,599.00

- non-economic losses:

    $50,000.00 × 50% = $25,000.00

16. Mr. Pallas made no claim against defendant with respect to his separate business, Northern Delights. Plaintiff is not entitled to losses, if any, suffered by Mr. Pallas.

17. The clerk of court shall enter judgment in favor of plaintiff and against defendant in the amount of $97,667.20, plus post-judgment interest at the current statutory rate. 28 U.S.C. § 1961.

DATED at Anchorage, Alaska, this  4th  day of May, 2016.

s/ H. Russel Holland  
United States District Judge